UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

BILLY JOE PAIGE,

        Plaintiff,                    Case No. 1:20-cv-629

v.                                       Honorable Paul L. Maloney

HEIDI WASHINGTON,

        Defendants.
_____/

## OPINION DENYING LEAVE
## TO PROCEED *IN FORMA PAUPERIS* - THREE STRIKES

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff seeks leave to proceed *in forma pauperis*. Because Plaintiff has filed at least three lawsuits that were dismissed as frivolous, malicious or for failure to state a claim, he is barred from proceeding *in forma pauperis* under 28 U.S.C. § 1915(g). The Court will order Plaintiff to pay the $400.00 civil action filing fee applicable to those not permitted to proceed *in forma pauperis*. This fee must be paid within twenty-eight (28) days of this opinion and accompanying order. If Plaintiff fails to pay the fee, the Court will order that this case be dismissed without prejudice. Even if the case is dismissed, Plaintiff must pay the $400.00 filing fee in accordance with *In re Alea*, 286 F.3d 378, 380-81 (6th Cir. 2002).

### Discussion

The Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which was enacted on April 26, 1996, amended the procedural rules governing a prisoner's request for the privilege of proceeding *in forma pauperis*. As the Sixth Circuit has stated, the PLRA was "aimed at the skyrocketing numbers of claims filed by prisoners–many of which are

meritless–and the corresponding burden those filings have placed on the federal courts." *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997). For that reason, Congress created economic incentives to prompt a prisoner to "stop and think" before filing a complaint. *Id.* For example, a prisoner is liable for the civil action filing fee, and if the prisoner qualifies to proceed *in forma pauperis*, the prisoner may pay the fee through partial payments as outlined in 28 U.S.C. § 1915(b). The constitutionality of the fee requirements of the PLRA has been upheld by the Sixth Circuit. *Id.* at 1288.

In addition, another provision reinforces the "stop and think" aspect of the PLRA by preventing a prisoner from proceeding *in forma pauperis* when the prisoner repeatedly files meritless lawsuits. Known as the "three-strikes" rule, the provision states:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under [the section governing proceedings *in forma pauperis*] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The statutory restriction "[i]n no event," found in § 1915(g), is express and unequivocal. The statute does allow an exception for a prisoner who is "under imminent danger of serious physical injury." The Sixth Circuit has upheld the constitutionality of the three-strikes rule against arguments that it violates equal protection, the right of access to the courts, and due process, and that it constitutes a bill of attainder and is *ex post facto* legislation. *Wilson v. Yaklich*, 148 F.3d 596, 604-06 (6th Cir. 1998).

Plaintiff has been an active litigant in the federal courts in Michigan. In more than three of Plaintiff's lawsuits, the court entered dismissals because the complaint was frivolous, malicious or failed to state a claim. *See Paige v. U.S. Dist. Ct., W.D. Mich.*, No. 2:11-cv-129 (W.D. Mich. May 26, 2011); *Paige v. Manisto, et al.*, No. 2:06-cv-32 (W.D. Mich., Feb. 13, 2006);

*Paige v. Violetta et al.*, No. 2:04-cv-183 (W.D. Mich. Dec. 8, 2004); *Paige v. Pennell, et al.*, No. 2:02-cv-169 (W.D. Mich., Apr. 7, 2003); *Paige v. Pandya*, No. 1:00-cv-33 (W.D. Mich., Mar. 8, 2000). Plaintiff also has been denied leave to proceed *in forma pauperis* under the three-strikes rule on approximately 20 prior occasions. *See, e.g., Paige v. Napel*, No. 2:12-cv-8 (W.D. Mich. Feb. 1, 2012); *Paige v. U.S. Dist. Ct. et al.*, No. 2:12-cv-3 (W.D. Mich. Jan. 12, 2012); *Paige v. Unknown Part(y)(ies) et al.*, No. 2:11-cv-505 (W.D. Mich. Feb. 2, 2012).

Moreover, Plaintiff's allegations do not fall within the "imminent danger" exception to the three-strikes rule. 28 U.S.C. § 1915(g). The Sixth Circuit set forth the following general requirements for a claim of imminent danger:

> In order to allege sufficiently imminent danger, we have held that "the threat or prison condition must be real and proximate and the danger of serious physical injury must exist at the time the complaint is filed." *Rittner v. Kinder*, 290 F. App'x 796, 797 (6th Cir. 2008) (internal quotation marks omitted). "Thus a prisoner's assertion that he or she faced danger in the past is insufficient to invoke the exception." *Id.* at 797-98; *see also* [*Taylor v. First Med. Mgmt.*, 508 F. App'x 488, 492 (6th Cir. 2012)] ("Allegations of past dangers are insufficient to invoke the exception."); *Percival v. Gerth*, 443 F. App'x 944, 946 (6th Cir. 2011) ("Assertions of past danger will not satisfy the 'imminent danger' exception."); *cf.* [*Pointer v. Wilkinson*, 502 F.3d 369, 371 n.1 (6th Cir. 2007)] (implying that past danger is insufficient for the imminent-danger exception).
>
> In addition to a temporal requirement, we have explained that the allegations must be sufficient to allow a court to draw reasonable inferences that the danger exists. To that end, "district courts may deny a prisoner leave to proceed pursuant to § 1915(g) when the prisoner's claims of imminent danger are conclusory or ridiculous, or are clearly baseless (i.e. are fantastic or delusional and rise to the level of irrational or wholly incredible)." *Rittner*, 290 F. App'x at 798 (internal quotation marks and citations omitted); *see also Taylor*, 508 F. App'x at 492 ("Allegations that are conclusory, ridiculous, or clearly baseless are also insufficient for purposes of the imminent-danger exception.").

*Vandiver v. Prison Health Services, Inc.*, 727 F.3d 580, 585 (6th Cir. 2013). A prisoner's claim of imminent danger is subject to the same notice pleading requirement as that which applies to prisoner complaints. *Id.* Consequently, a prisoner must allege facts in the complaint from which

3

the Court could reasonably conclude that the prisoner was under an existing danger at the time he filed his complaint, but the prisoner need not affirmatively prove those allegations. *Id.*

Plaintiff presently is incarcerated at the Marquette Branch Prison (MBP), though most of the actions about which he complains occurred while he was housed at the Carson City Correctional Facility (DRF). Plaintiff alleges that Defendant MDOC Director Heidi Washington did not take quick enough action in March and April of this year in response to the COVID-19 pandemic, thereby placing Plaintiff at risk of contracting the disease. Specifically, Plaintiff contends that, although all prison facilities were locked down on March 13, 2020, the MDOC did not take immediate action in March and April to ensure that all staff members were tested before entering the facility. Plaintiff complains that he is at particular risk of contracting the disease, because he uses a CPAP machine to correct a condition causing shortness of breath. Plaintiff also alleges that he presently is suffering a mild respiratory illness, which he believes is consistent with COVID-19. He seeks prospective injunctive relief in the form of greater protections and release from custody.

To the extent that Plaintiff alleges that Defendant took inadequate measures in March and April of this year, his allegations fail to show imminent danger, because those alleged actions occurred in the past, and three months have gone by since those alleged failures. As discussed, past harms or risks of harm do not demonstrate imminent danger. *Vandiver*, 727 F.3d at 585. In addition, the Court notes that there are currently no confirmed cases of prisoners with COVID-19 at MBP, where Plaintiff is now housed, and only one confirmed case has arisen at DRF, where he formerly was housed. (*See* https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337 (updated July 29, 2020; last

4

visited July 30, 2020). Plaintiff offers only his generalized and speculative fears that he is at a higher risk for contracting COVID-19 at MBP.

Moreover, the MDOC has taken significant measures to limit the threat posed by COVID-19:

- **Personal Protective Equipment, cleaning and mitigation measures**
- Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear. Each employee and prisoner received three masks each and the masks can be laundered and worn again. Facility staff are also permitted to bring their own PPE, such as masks, gloves and gowns. Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering. Michigan State Industries also manufactured gowns, protective eyewear and protective suits. Every facility was expected to receive a new order of MSI masks for both prisoners and staff as of late July. These are made of a lightweight material for use during the summer months. Prisoners will receive three each and staff will receive three each as well. FOA and Central Office staff will be receiving new masks as well.
- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.
- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning. Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use. Cleaning efforts have been doubled at facilities with vulnerable prisoner populations. We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap. Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask. Additional soap will be provided at no charge. CDC posters detailing proper hygiene practices have been posted in correctional facilities and have also been recreated digitally so they play on TV screens throughout our facilities. These are the same posters you will see in your community and throughout State of Michigan office buildings.
- Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart. Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard. Activities such as basketball and weight pit have been suspended to encourage social distancing, as well. There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.
- The department has been leading the nation when it comes to consistent testing of the prisoner population. Following the completion Friday, May 22, of testing prisoners at Michigan Reformatory in Ionia for COVID-19, the Michigan Department of Corrections has completed its goal of testing every prisoner in its system. . . .
- **Visits and Transfers**
- Visitation at facilities statewide was suspended as of March 13.

- After suspending visitation at all correctional facilities to protect the health of staff, prisoners, and the public, Director Heidi Washington convened a Visiting Operations Committee to develop recommendations for reactivating prisoner visits. The committee recommended establishing a pilot project to evaluate the use of video visitation technology and online scheduling of prisoner visits. . . .
- The department worked with communication vendors GTL and JPay to provide enhanced services for prisoners to communicate with family and friends during the period without visits. JPay is continuing to offer two free stamps per week and a 10% discount on stamps through Aug. 31, 2020. GTL's internet and mobile fees are reduced with the regular $2.95 transaction fee reduced to $1.95 and the $1.95 transaction fee reduced to $0.95. GTL had previously provided one free, five-minute phone call every seven days for the first two weeks of May 2020 and, for the entire month of May, GTL reinstated the internet and mobile fees with reduced rates. We will continue to work with the companies on anything else they may be willing to provide.
- In connection with visitation suspension, face-to-face college classes at all facilities have also been suspended effective immediately. The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses. Core programming and school classes taught by MDOC staff will continue.
- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol. Attorney visits will continue to be authorized.
- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.
- The department issued protocol to all county sheriff offices to offer guidance on screening and other preventative measures.
- **Quarantine and Care of Sick Prisoners**
- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus. The MDOC does not make the diagnosis of the coronavirus. The department is following the Michigan Department of Health and Human Services protocol. If a prisoner has symptoms and meets the criteria for testing, the MDOC can test the prisoner.
- Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.
- Prisoners who test positive may be transferred to the department's designated quarantine unit at G. Robert Cotton Correctional Facility. The department also previously operated quarantine units at Carson City Correctional Facility and the former Maxey Annex, which is located near Woodland Center Correctional Facility. . . . These units are in buildings that are completely separated from each of the correctional facilities. They had limited movement and access to these units was extremely limited. Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people entering. Those staff members report directly to the unit and do not enter the main correctional facility. Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.
- Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.

- Co-pays for prisoners who need to be tested for COVID-19 have been waived.
- Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated.  Prisoners who require outside medical attention will be transported to an area hospital for treatment.
- Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.
- **Parole Information**
- The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time. In addition, the department will begin holding remote public Parole Board hearings for parolable life sentence and clemency cases. . . .
- The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.
- We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness. . . .
- The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration. . . .
- We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.
- All of our paroles are done with public safety in mind.  The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.
- All prisoners set to parole must take a COVID-19 test before being released.  The MDOC is working to expedite the parole release of those individuals who can safely and legally be released at this time.  There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release. . . .
- **Staff Measures and Information**
- The need for social distancing to help prevent the spread of this virus has included asking organizations to have as many people telecommute as possible, and the MDOC is doing that to the extent we can. . . .
- ALL correctional facility employees continue to report to work.  Our facilities need to continue operating as close to normal as possible for the safety of those both outside and inside the institution.  We need to continue to keep those incarcerated engaged and occupied in a productive manner to ensure the stability, safety and security of our facilities. . . .
- Anyone entering facilities will be subject to enhanced screening prior to entering.  This includes answering screening questions and having their temperatures taken.  Anyone suspected of having symptoms will not be allowed in the facility. . . .
- **Operational Changes**
- Corrections Transportation Officers or other department staff will be reassigned to facilities to augment custody staff as determined by Assistant Deputy Directors.
- No out-of-state business travel will be allowed until further notice.  All in-state business travel should be for essential matters only.

- Most construction projects have been placed on hold.  Each project will be evaluated on a case-by-case basis.
- Staff are encouraged to use phone calls, email and teleconferencing in place of in-person meetings when possible.  Any necessary in-person meetings should be limited as much as possible and the size of the meeting should be reduced to allow for attendees to stay the recommended 6-foot distance apart.

(*Id.*)  Further, the MDOC issued a COVID-19 Director's Office Memorandum (DOM) on April 8, 2020, and issued a revised DOM on the subject on May 26, 2020, *see* MDOC DOM 2020-30R2 (eff. May 26, 2020) (outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer), and again on May 27, 2020, *see* MDOC DOM 2020-30R3 (eff. May 27, 2020) (same).  Among the newly adopted procedures, the DOM states that "[c]ell moves shall only be made if absolutely necessary (e.g., medical, PREA)."  (*Id.*)

In sum, the MDOC has taken extraordinary measures to protect prisoners from exposure to COVID-19, and the lack of cases at Plaintiff's present facility further reduces any likelihood that Plaintiff is in imminent danger.  Further, to the extent that Plaintiff indicates that he was suffering a mild respiratory illness at the time he filed his complaint, he neither makes allegations concerning his inability to get treatment or testing nor sues medical officials.  Under Defendant Washington's policies, any prisoner with symptoms of COVID-19 is entitled to be seen without a co-pay and tested.  Plaintiff makes no allegation that he has been denied any such treatment.  He therefore fails to allege that his symptoms place him in imminent danger.

While the Court is sympathetic to Plaintiff's general concern about the COVID-19 virus, speculation about the mere possibility that he will become infected by the virus does not constitute imminent danger.

Therefore, § 1915(g) prohibits Plaintiff from proceeding *in forma pauperis* in this action.  Plaintiff has twenty-eight (28) days from the date of entry of this order to pay the entire civil action filing fee, which is $400.00.  When Plaintiff pays his filing fee, the Court will screen

his complaint as required by 28 U.S.C. § 1915A and 42 U.S.C. § 1997e(c).  If Plaintiff does not pay the filing fee within the 28-day period, this case will be dismissed without prejudice, but Plaintiff will continue to be responsible for payment of the $400.00 filing fee.


Dated:   August 7, 2020              /s/ Paul L. Maloney
                                     Paul L. Maloney
                                     United States District Judge


**SEND REMITTANCES TO THE FOLLOWING ADDRESS**:

Clerk, U.S. District Court
399 Federal Bldg.
110 Michigan St., N.W.
Grand Rapids, MI 49503

**All checks or other forms of payment shall be payable to "Clerk, U.S. District Court."**